1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
10                 San Francisco Division
11

12    CIRON B. SPRINGFIELD,              Case No. 14-cv-05676-LB

                     Plaintiff,
13
                                          **ORDER GRANTING SUMMARY**
14         v.                             **JUDGMENT FOR THE DEFENDANTS**

15    M. MOORE, et al.,                   [Re: ECF No. 29 ]

                     Defendants.
16
17
18                        **INTRODUCTION**

19        Ciron B. Springfield filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 to

20    complain about the conditions at the Salinas Valley Psychiatric Program, where he earlier was

21    housed. The parties have consented to proceed before a magistrate judge. (ECF Nos. 6 and 19.)[1]

22    The defendants now move for summary judgment, and Mr. Springfield opposes the motion. For

23    the reasons discussed below, the court grants the motion for summary judgment and will enter

24    judgment against Mr. Springfield.

25
26
27
28    ─────────────
      [1] Citations are to material in the Electronic Case File ("ECF"); pinpoint cites are to the ECF-
      generated page numbers at the top of the documents.

United States District Court
Northern District of California

# STATEMENT

In this action, Mr. Springfield sues two defendants for violating his Eighth Amendment rights. The defendants served on committees that met on January 4, 2013, and February 8, 2013, to decide custody level and housing placement for Mr. Springfield, who had arrived at Salinas Valley State Prison on or about December 27, 2012, to be housed in a psychiatric hospital within that prison. Mr. Springfield contends that the defendants' decisions at those committee meetings (a) interfered with care for his serious mental health needs, and (b) caused him to be denied outdoor exercise for about three months.

The following facts are undisputed unless otherwise noted.

The events and omissions giving rise to Mr. Springfield's complaint occurred in late 2012 – early 2013. Mr. Springfield was a prisoner serving a sentence of 50 years to life. (ECF No. 13 at 36.) Both of the defendants worked for the California Department of Corrections (CDCR) at the relevant time: A. Meden was a Correctional Counselor II and M. Moore was an associate warden at Salinas Valley State Prison.

## A. Psychiatric Hospital Within A Prison

Salinas Valley State Prison is home to the Salinas Valley Psychiatric Program (SVPP), one of the California Department of State Hospitals' three psychiatric programs located on prison grounds. (ECF No. 13-1 at 6.) The SVPP is an intermediate care program. (*Id.*) Although the SVPP is located on the prison grounds, it is staffed by the Department of State Hospitals (DSH). (ECF No. 31 at 3.)

The SVPP is "jointly operated" by the CDCR and DSH. The CDCR staff's involvement in the day-to-day function of the SVPP is limited to moving inmate-patients in and out of the housing unit, conducting disciplinary and classification hearings, and responding to alarms. (*Id.*) The DSH staff controls the activities and management of the SVPP, including out-of-cell time and exercise for inmate-patients. (*Id.* at 4.)

Each inmate-patient in the program is assigned an interdisciplinary treatment team (IDTT) composed of DSH staff, including social workers, psychiatrists, and psychologists. The IDTT makes decisions about the inmate-patient's treatment, identifies his treatment needs, and sets

goals. The IDTT is scheduled to meet within three days of the inmate-patient's admission to the program, 10 days later, 30 days after that, and every 90 days thereafter. (ECF No. 13 at 19.)

**B.  Prisoners Are Classified Upon Arrival At SVPP**

When an inmate arrives at Salinas Valley State Prison for admission to the SVPP, an Institutional Classification Committee (ICC) from the CDCR reviews the inmate-patient to assess his housing placement and custody level. (ECF No. 30 at 2.) The "custody level" is a designation "to establish where an inmate shall be housed and assigned, and the level of staff supervision required to ensure institutional security and public safety." Cal. Code Regs. tit. 15, § 3377.1(a). The custody levels range from the most restrictive to least restrictive: Maximum (or "max") Custody, Close-A Custody, Close-B Custody, Medium-A Custody, Medium-B Custody, Minimum-A Custody, and Minimum-B Custody. *Id.* Mr. Springfield's claims are based on difference in conditions between Maximum Custody and Close-A Custody.

The regulation provides for some differences between Maximum Custody and Close-A Custody. Maximum Custody inmates are usually housed in segregated housing rather than the general population, have limited activities and assignments within their segregated housing, and "shall be under the direct supervision and control of custody staff." *Id.* at § 3377.1(a)(1). Close-A Custody inmates are allowed to be double-celled in the general population of a Level III or Level IV prison, are permitted to participate in programming and activities during the day, and have "direct and constant" supervision by staff. *Id.* at § 3377.1(a)(2).

As a Correctional Counselor II, Mr. Meden was responsible for ensuring the proper classification of hundreds of inmates. Mr. Meden chose to personally serve on committees for inmates who came to the SVPP from administrative segregation at other prisons, because prior housing in administrative segregation indicated a potential safety concern or disciplinary history that required extra care to ensure safe housing. Mr. Meden personally reviewed inmate files to prepare for hearings to determine the most appropriate and least restrictive safe housing for each inmate. As a committee member, he saw about 10-50 cases per week, which included about five inmate headed for the SVPP. (ECF No. 30 at 2-3.)

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    Mr. Meden took on Mr. Springfield's case because Mr. Springfield came to Salinas Valley

2    from administrative segregation at the California Medical Facility in Vacaville. When he arrived at

3    Salinas Valley State Prison, Mr. Springfield was already designated Maximum Custody. (ECF No.

4    30; ECF No. 1 at 6.) According to Mr. Springfield, he was already Maximum Custody because he

5    was being investigated, or had been under investigation, for his alleged association with a prison

6    gang. (ECF No. 32-1 at RT 68-69, 90, 93; *see also* ECF No. 39 at 10 (Springfield argues he "was

7    in administrative segregation pending an investigation into his involvement in a prison gang;

8    wherein the plaintiff was designated max custody before he arrived at SVSP/SVPP.")[2]

9    **C.  The January 4, 2013 ICC Hearing**

10   Mr. Springfield arrived at Salinas Valley State Prison on December 27, 2012, for treatment at

11   the SVPP. He was seen by the ICC on January 4, 2013. The chairman of that ICC was Mr. Moore,

12   and the committee members were Mr. Meden, social worker Hernandez, and facility captain

13   Kircher. A staff assistant, A. Partida, was assigned to Mr. Springfield because he was a participant

14   in the mental-health-services delivery system. (*See* ECF No. 13 at 36.)

15   According to Mr. Meden, before the ICC hearing began, the ICC was prepared to reduce Mr.

16   Springfield's custody level from Maximum Custody to Close-A custody, "and to clear him for

17   dormitory housing." (ECF No. 30 at 3.) Things changed at the hearing, however, due to a safety

18   issue that arose.

19   The parties dispute whether Mr. Springfield *verbally* expressed safety concerns at the ICC

20   hearing. According to the defendants, Mr. Springfield "said that he had safety concerns due to

21   being investigated for gang involvement." (ECF No. 31 at 2; *see also* ECF No. 30 at 3.) Mr.

22

23       [2] Although the disagreement does not make a difference in this case, the parties disagree as to
24   whether the investigation into Mr. Springfield's involvement in a prison gang was *ongoing* when
     he was at the California Medical Facility before his transfer to SVPP. Mr. Meden states that Mr.
25   Springfield was in administrative segregation due to an ongoing investigation into his involvement
     with the Black Guerilla Family prison gang. (ECF No. 3 at 3.) Mr. Springfield states that the gang
26   validation had been rescinded. (ECF No. 1 at 6.) An inmate appeal response submitted by Mr.
     Springfield indicated that (a) he had been validated as an associate of a prison gang in March
27   2012, (b) the validation was rescinded due to the failure to provide a procedural protection to him,
     and (c) the rescission "will not preclude any future validation packages on [Mr. Springfield] from
28   being submitted" to the Office of Correctional Safety for gang validation review. (ECF No. 13-1 at
     30.)

United States District Court
Northern District of California

Springfield's version is: "I didn't say that I have safety concerns. I said it would be hazardous to place me in that environment right there." (ECF No. 32-1 at 91-92.) For summary-judgment purposes, the court views the evidence in the light most favorable to the nonmovant, and proceeds on the assumption that Mr. Springfield did not utter the words "I have safety concerns."

Even if Mr. Springfield did not utter the words, "I have safety concerns," it is undisputed that he delivered to the ICC for the January 4, 2013, hearing a declaration that conveyed safety concerns. Mr. Springfield provided to the ICC a written declaration under penalty of perjury, in which he stated that he was "ineligible" to be housed in a shared cell or in a dormitory due to the investigation into his association with a prison gang. (ECF No. 13-1 at 3-4.) His declaration further stated that to put him in a dorm setting "is unduly hazardous to the declarant safety," he must be assigned a single cell, he "disagree[s] with (ICC) decision to house him in a dormitory," and that such housing would "hazardous to his safety." (*Id.*)[3]

---

[3] Mr. Springfield's declaration stated:

> Upon review of the declarant case factors it will be determined that he is under investigation pending prison gang association. (See CDC 128-G dated June 6, 2011 which read "case factors indicated that the subject is not an active gang member only having association with the group." (Exhibit (A)). This critical information render the Declarant <u>INELIGIBLE</u> to be housed in a dormitory with other documented inmates of various gang denominations, as cell partners in a 2 or 4 man dorm. To place the declarant in a dorm setting with the aforemention information astute is unduly hazardous to the declarant safety. (CMF) Chief Deputy Warden (CDW) Brian Duffy made the following decision on June 6, 2012 "<u>TEMPORARILY REDUCE CUSTODY TO CLO A FOR DMH/ICF CELL PROGRAMMING PURPOSES ONLY.</u>" (Exhibit (B), p. 3). (CDW) Brian Duffy decision to house the declarant in "DMH/ICF CELL PROGRAMMING" was to preserve his safety, furthermore, (CDW) Brian Duffy reprimanded the declarant "RE" designation (See bottom of CDC 128-G dated 6/6/12 where "RE" designation is lined out." (Exhibit (B), p. 3). The declarant must be temporarily assigned single cell status for full (SVPP) programming. [¶] In summa, the declarant disagree with (ICC) decision to house him in a dormitory it would be hazardous to his safety until the misidentification of prison gang association is annulled and expunged from all records in relation to his person. CCR Title 15 vest "staff will also consider other available information that would indicate an immediate safety concern for the inmate such as (prison gang association)." (3269.1)

(ECF No. 13-1 at 3-4 (errors, capitalization and underlining in original).

United States District Court
Northern District of California

1

2       Due to Mr. Springfield's expression of safety concerns relating to the gang investigation, the

3   ICC on January 4, 2013, decided to keep Mr. Springfield on Maximum Custody. (ECF No. 13 at

4   36; ECF No. 30 at 3; ECF No. 31 at 3.) According to Mr. Springfield, the ICC rejected social

5   worker Hernandez's recommendation to lower Mr. Springfield's custody classification. (ECF No.

6   1 at 6.)

7       Mr. Springfield filed an inmate appeal on January 8, 2013, about the ICC's determination not

8   to reduce his custody level from Maximum Custody to Close-A Custody. (ECF No. 13 at 25-28.)

9   He requested another ICC hearing to have his custody status lowered from Maximum Custody to

10  Close-A Custody. Although he wanted his custody level reduced, he wanted to keep his single cell

11  designation and his "Restricted Temporarily" integrated housing code to avoid placement in a

12  dorm or being housed with a cellmate. (*Id.*) Mr. Springfield's inmate appeal was returned to him

13  to correct a clerical problem; he corrected that problem and resubmitted the appeal on January 23,

14  2013. (*Id.* at 25.) The inmate appeal was assigned to Mr. Meden at the first level of review. (ECF

15  No. 30 at 4.)

16      Mr. Meden interviewed Mr. Springfield on February 8, 2013 about the inmate appeal. During

17  the interview, Mr. Springfield requested that his custody level be lowered because the Maximum

18  Custody designation limited his group therapy and yard time. Mr. Meden had Mr. Springfield

19  appear before an ICC that day to lower his custody level. (*Id.*)

20  **D.  The February 8, 2013 ICC Hearing**

21      Mr. Moore and Mr. Meden both served on the ICC that considered Mr. Springfield's case on

22  February 8, 2013. "Mr. Springfield had told SVPP staff that he no longer had safety concerns and

23  could safely program with others at the SVPP, and he confirmed to the committee that those

24  statements were still true." (ECF No. 31 at 3.) The ICC lowered Mr. Springfield's custody level to

25  Close-A and approved him for double-celling. (*Id.*) The ICC also changed his credit-earning status

26  to "A1A" effective December 27, 2012 (i.e., the day of his arrival at Salinas Valley State Prison),

27  so that he would not be penalized for expressing safety concerns at the January 4, 2013 ICC

28  hearing. (*Id.*; ECF No. 13 at 37.) As a result of the change in his credit-earning status, Mr.

United States District Court
Northern District of California

1   Springfield would earn credits toward his 50-years-to-life sentence according to the formula set

2   out by the California Penal Code for the time he served at Salinas Valley State Prison. (ECF No.

3   31 at 3.)

4       Mr. Springfield's Maximum Custody status ended after the ICC hearing on February 8, 2013.

5   As of February 9, he was reduced to Close-A Custody. (ECF No. 32-1 at RT 53.)

6   **E.  Life In The SVPP**

7       The daily routine for inmate-patients in the SVPP was determined by DSH staff and not by the

8   CDCR staff. (ECF No. 31 at 4.) Mr. Moore and Mr. Meden were both aware that the DSH policy

9   in the SVPP did not allow Maximum Custody inmates to participate in a group outside exercise

10   yard. (ECF No. 31 at 4; ECF No. 30 at 5.) "SVPP policy also prescribed daily out-of-cell time for

11   max custody inmate-patients." (ECF No. 31 at 4.) Also, DSH "policy dictated that SVPP max

12   custody inmate-patients were to have contact with their clinicians (including the [IDTT]) and with

13   medical technical assistants who run the day to day function of the unit, delivering medication,

14   mail, and other items. The policy permitted max custody inmate-patients to attend medical

15   appointments and to have visitors." (*Id.*)

16       On January 8 and 9, Mr. Springfield had visits from clinician Dr. Wei, who adjusted Mr.

17   Springfield's medications. (ECF No. 32-1 at RT 42-43.) Dr. Wei visited after Mr. Springfield

18   asked to speak to someone upon becoming depressed and self-injurious. (*Id.* at RT 42-43.) Dr.

19   Wei did not remove Mr. Springfield from his cell, however, due to his Maximum Custody status.

20   (*Id.* at RT 43-44.) Mr. Springfield also saw the IDTT on several occasions, went to several

21   medical appointments, and saw the medical technical assistant daily when he received his

22   medications. (*Id.* at RT 49, 56, 59.)

23       While on Maximum Custody, Mr. Springfield was allowed to go to a day room that was a little

24   smaller than a basketball court, where he could do things such as watch TV or talk on the phone.

25   (*Id.* at RT 57-59.) He was taken in shackles and allowed in the day room, but only by himself, for

26   an hour per day. (*Id.* at RT 58.) The record is not entirely clear, but it appears that Mr. Springfield

27   remained in shackles during his time in the day room. Although he was supposed to go to the day

28   room every day, he was taken there only about 2-4 days per week. (*Id.* at RT 105-06.) There is no

1   evidence that the defendants knew that he would not be allowed daily out-of-cell time when the

2   ICC decided on January 4, 2013 to continue his Maximum Custody status.

3      Mr. Springfield was not allowed to attend the law library while on Maximum Custody. He

4   could obtain materials using a paging system, and he did obtain over 20 books or cases via the

5   paging system. (*Id.* at RT 60-62.)

6      During his time on Maximum Custody, Mr. Springfield was not allowed to participate in

7   "structured group therapy" and other group activities. (ECF No. 13 at 8.) Once he obtained access

8   to groups, he did not attend all the group activities, in part because there were not "really good

9   groups" in Stage 1 of the program. (ECF No. 32-1 at RT 115-16.)

10     Mr. Springfield did some exercise in his cell, but generally found it "not inspiring" to do

11  exercise there. (*Id.* at RT 62-64, 67.)

12     Once he was taken off Maximum Custody status by the ICC on February 8, it was up to the

13  IDTT whether he got to go to the yard or not. (*Id.* at RT 108.) In other words, after February 8,

14  there was nothing the ICC could do for him. (*Id.* at RT 108.) Even though the ICC reduced his

15  custody status to Close-A on February 8, Mr. Springfield did not go to the yard until April because

16  he had to move up through the stages of the SVPP program to get yard time. (*Id.* at RT 110.)

17  There is no evidence that the defendants had any direct or indirect control over Mr. Springfield's

18  access to the exercise yard after February 8, 2013.

19     Mr. Springfield did not know either of the defendants before the ICC hearing on January 4,

20  2013, and has not interacted with either of them since then except for the February 8, 2013 hearing

21  and the one interview by Mr. Meden for his appeal. (*Id.* at RT 117.)

22                          **SUMMARY-JUDGMENT STANDARD**

23     The court must grant a motion for summary judgment if the movant shows that there is no

24  genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

25  law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Material

26  facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

27  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

28  the non-moving party. *Id*. at 248-49.

United States District Court
Northern District of California

8

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex,* 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd*., 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where, as is the situation with the defendants' qualified immunity defense, the moving party bears the burden of proof at trial, she must come forward with evidence that would entitle her to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). She must establish the absence of a genuine dispute of fact on each issue material to his affirmative defense. *Id.* at 1537; *see also Anderson*, 477 U.S. at 248. When the moving party has come forward with this evidence, the burden shifts to the non-movant to set

9

forth specific facts showing the existence of a genuine dispute of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Springfield's original complaint, but not his amended complaint, is signed under penalty of perjury and is evidence for purposes of evaluating the defendants' motion for summary judgment.

# ANALYSIS

## A.  Deliberate Indifference To Mental Health Care Claim

Deliberate indifference to an inmate's serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* The "requirements for mental health care are the same as those for physical health care." *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

Although neither party specifies the precise problem that prompted Mr. Springfield's transfer to SVPP, the evidence in the record shows that Mr. Springfield had a mental health problem severe enough to require his placement in a psychiatric hospital. That suffices to permit a jury to find the existence of an objectively serious mental health care need.

United States District Court
Northern District of California

Even viewing the evidence in the light most favorable to Mr. Springfield, he has not established that he was deprived of care for his serious mental health problem. During the time he was on Maximum Custody, Mr. Springfield indisputably had access to clinicians at the SVPP, the IDTT, and a medical technical assistant. Dr. Wei met with Mr. Springfield and changed his medications just a few days after the ICC hearing on January 4, 2013. Mr. Springfield also met with his IDTT. And he received medications daily from the medical technical assistant and went to medical appointments while in the SVPP.

Mr. Springfield did not have access to group therapy during his 35 days on Maximum Custody status, but he has not shown that the lack of group therapy posed a substantial risk of serious harm to his mental health. He does not provide any evidence that he would have been cleared for group therapy, even with a lower custody level, as long as he expressed safety concerns. The other inmate-patients in those groups might have included the inmates about whom he had expressed safety concerns.

Mr. Springfield states that he did not have "one-one-one" meetings with his clinician while on Maximum Custody, but he fails to show that his Maximum Custody status prevented such meetings. For example, he does not explain why such meetings could not take place at his cell front or why he could not be taken in restraints to the sessions. Indeed, the evidence in the record points toward these options being available: Dr. Wei did come to his cell front twice and Mr. Springfield was taken out of his cell for other medical appointments.

The subjective prong of the Eighth Amendment claim requires that a defendant exhibit deliberate indifference to that serious medical or mental health care need. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If the defendant should have been aware of the risk, but was not, then he has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim). Negligence does not amount to deliberate indifference. *See Toguchi*, 391 F.3d at 1057; *see also Farmer,* 511 U.S. at 835.

They have met their burden on summary judgment of showing the absence of evidence that they acted with the deliberate indifference. Even viewing the evidence in the light most favorable to Mr. Springfield (as the non-movant), no reasonable juror could conclude that either defendant knew that Mr. Springfield faced a substantial risk of serious harm and disregarded it.

The undisputed evidence shows that the defendants determined to keep Mr. Springfield at Maximum Custody status because he informed them of a danger to him if he were placed in the dormitory or shared housing in the SVPP. The defendants' actions to address Mr. Springfield's safety concerns do not reflect deliberate indifference to his mental health needs, particularly given the availability of some mental-health-care even while on Maximum Custody status. (Indeed, had they failed to heed his warnings and put him in shared housing, they could face a deliberate indifference to safety claim from Mr. Springfield. *See generally Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (prison officials have a duty to protect inmates from violence at the hands of other prisoners).) That safety concerns, rather than deliberate indifference, drove the defendants' decision-making is further evidenced by the fact that the defendants lowered his custody level once Mr. Springfield informed them that he no longer had safety concerns.

There is no evidence that Mr. Meden and Mr. Moore knew of and disregarded Mr. Springfield's mental-health needs when they decided at the ICC hearing on January 4, 2013 to keep him on Maximum Custody. It is undisputed that Mr. Meden and Mr. Moore expected that Mr. Springfield would be able to receive mental health care even if on Maximum Custody status. The DSH policy for Maximum Custody inmate-patients at SVPP called for the inmate-patients to

United States District Court
Northern District of California

1    have contact with their clinicians, including the IDTT; to have contact with the medical technical

2    assistants who ran the day-to-day functions of the unit and delivered medications; and to attend

3    medical appointments. The undisputed evidence also shows that the SVPP schedule called for Mr.

4    Springfield to be seen by his treatment team three days after his admission, 10 days thereafter, 30

5    days after that, and every 90 days thereafter. With the undisputed evidence showing that

6    defendants knew that, even on Maximum Custody, Mr. Springfield would be able to see mental

7    health care providers and obtain treatment, no reasonable jury could find that the defendants knew

8    that Mr. Springfield faced a substantial risk of serious harm and disregarded that risk when they

9    decided to retain him on Maximum Custody.

10        Mr. Springfield argues that a reasonable official would have known that it would violate the

11   Eighth Amendment to fail to act in accordance with the two CDCR instructional memoranda

12   regarding the intermediate psychiatric care facilities on prison grounds. (ECF No. 39 at 20; ECF

13   No. 13-1 at 6-20 and 22-25.) He is wrong on several points. First, the CDCR, and the memoranda

14   issued by its high level staff do not establish Eighth Amendment standards. Second, even if the

15   memoranda were relevant to the Eighth Amendment claim, Mr. Springfield has not shown that the

16   defendants acted contrary to them. He highlighted several passages of the memoranda but does not

17   show how the defendants' actions were impermissible under those passages or any other part of

18   the memoranda. The July 16, 2009, memorandum allowed the ICC more than one way to deal

19   with an inmate who had a determinate or indeterminate SHU term; one of the permissible choices

20   was to "[l]eave the determinate or indeterminate SHU term and Max Custody in place through

21   transfer where there are serious safety and/or security concerns." (ECF No. 13-1 at 9.) That

22   memorandum also allowed the ICC to consider safety and security concerns. (*See id.* at 17.) Mr.

23   Springfield has not identified any provision in the October 24, 2011, memorandum that the ICC's

24   decision violated. And the barely legible chart he includes (ECF No. 13-1 at 25) does not apply to

25   the SVPP, as the heading at the top states it is for Atascadero State Hospital and the Vacaville

26   Psychiatric Programs and does not mention the SVPP. (According to the July 16, 2009

27   memorandum, the SVPP was used for inmates with higher custody levels.)

28        On the evidence in the record, no reasonable jury could find that the defendants knew of and

1   disregarded a substantial risk to Mr. Springfield's mental health needs in deciding to retain him on

2   Maximum Custody after he expressed safety concerns.

3       **B.  Claim For Denial Of Outdoor Exercise**

4       The denial of outdoor exercise also may result in a violation of an inmate's Eighth

5   Amendment rights. As with other conditions of confinement claims, including medical care

6   claims, an Eighth Amendment claim for a denial of outdoor exercise has an objective and

7   subjective prong.

8       The long-term deprivation of outdoor exercise for prisoners ordinarily constitutes a sufficiently

9   serious deprivation for the objective prong of an Eighth Amendment claim. *Thomas v. Ponder*,

10  611 F.3d 1144, 1151 (9th Cir. 2010). *See, e.g., id.* (denial of "out-of-cell exercise" for 13 months

11  and 25 days is sufficiently serious to establish objective prong of Eighth Amendment claim);

12  *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (denial of outdoor exercise for

13  six and one-half weeks meets objective prong of Eighth Amendment claim); *Allen v. Sakai*, 48

14  F.3d 1082, 1087-88 (9th Cir. 1994) (denial of outdoor exercise for six weeks to a prisoner in

15  indefinite segregation sufficient to satisfy objective prong of Eighth Amendment claim).

16      The court will assume for present purposes that the denial of outdoor exercise for 35 days is

17  sufficiently serious to establish the objective prong of an Eighth Amendment claim, although 35

18  days is a shorter period than any period the Ninth Circuit has found to be sufficient to satisfy the

19  objective prong.

20      Mr. Springfield blames the defendants for his lack of access to the exercise yard from

21  December 27, 2012 until April 2013. The court disagrees that the defendants are responsible for

22  the entire period. When, as here, the prisoner seeks damages against a defendant, the "inquiry into

23  causation must be individualized and focus on the duties and responsibilities of each individual

24  defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v.

25  Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). *Leer* explained that "it is important to distinguish the

26  causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to

27  damages." *Id.* In the former case, a broader and more generalized approach to causation is taken.

28  *Id.*

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant.
> . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633-34 (citations omitted). Messrs. Moore and Meden thus would not have exposure for every shortcoming at Salinas Valley State Prison or in the SVPP, but only if they personally were deliberately indifferent.

There is sufficient evidence to support a finding that the defendants' decision at the January 4, 2013, ICC hearing caused Mr. Springfield not to receive access to the exercise yard from January 4, 2013, through February 8, 2013, but not for any of the days before or after that 35-day period. No reasonable jury could find the defendants' actions caused the denial of access to the exercise yard on the eight days from December 27, 2012, until January 4, 2013, because the defendants had not yet made any decision in Mr. Springfield's case. And no reasonable jury could find the defendants caused any denial of access to the exercise yard during the period after February 8, 2013, because on that date the defendants reduced Mr. Springfield's custody level to a level where he would be allowed on the exercise yard.  Mr. Springfield admits the defendants could not control his access to the exercise yard after February 8, 2013. Thus, the question is whether the defendants violated Mr. Springfield's Eighth Amendment rights by making a decision that caused him to be denied access to outdoor exercise for 35 days. As mentioned above, the court assumes for present purposes that the 35-day denial of exercise satisfies the objective prong of an Eighth Amendment claim.

The prisoner also must satisfy a subjective prong for an Eighth Amendment claim based on the denial of outdoor exercise. *See Thomas*, 611 F.3d at 1150. That is, he must show that the prison official knew of and disregarded a substantial risk of serious harm to his health or safety. *See id.*

15

United States District Court
Northern District of California

1    Mr. Springfield's Eighth Amendment claim that he was denied outdoor exercise fails on the

2    subjective prong. Defendants have met their burden on summary judgment by showing the

3    absence of evidence that they acted with the deliberate indifference. Even viewing the evidence in

4    the light most favorable to Mr. Springfield (as the non-movant), no reasonable juror could

5    conclude that either defendant knew that Mr. Springfield faced a substantial risk of serious harm

6    and disregarded it.

7    The undisputed evidence shows that the defendants determined to keep Mr. Springfield on

8    Maximum Custody because of his expressed safety concerns. Such actions to address Mr.

9    Springfield's safety concerns do not reflect deliberate indifference to a risk that would arise from a

10   deprivation of outdoor exercise under the circumstances. That safety concerns, rather than

11   deliberate indifference, drove their decision-making is further evidenced by the fact that the

12   defendants lowered his custody level once Mr. Springfield informed them that he no longer had

13   safety concerns.

14   The undisputed evidence shows that, when the defendants made their decision at the January 4,

15   2013 ICC hearing, they knew that inmate-patients on Maximum Custody did not have access to an

16   outside group exercise yard. But the defendants also knew that SVPP policy allowed Maximum

17   Custody inmate-patients daily out-of-cell time, phone calls, family visits, access to medical

18   appointments, and contact with mental-health care providers. At the time, the defendants also

19   knew that even Maximum Custody inmate-patients had their treatment and status reviewed by the

20   IDTT at scheduled intervals starting within three days of admission to the SVPP, and that the

21   IDTT would determine Mr. Springfield's access to programs and activities.

22   With regard to the out-of-cell time, the evidence shows that, notwithstanding the SVPP policy,

23   Mr. Springfield was not allowed out his cell every day to go to the dayroom. But there is no

24   evidence that the defendants were aware that Mr. Springfield would not receive the daily out-of-

25   cell time called for in the SVPP policy. The failure of the DHS program to provide the scheduled

26   daily out-of-cell time cannot be attributed to the defendants. On the evidence in the record, a

27   reasonable jury could not find that the defendants knew that the SVPP policy for daily out-of-cell

28   time would not be followed.

United States District Court
Northern District of California

1    Mr. Springfield argues that the defendants have Eighth Amendment liability based on the fact

2 that they signed the responses to his inmate appeal about the January 4, 2013 ICC decision. This

3 argument is unpersuasive. The defendants' response to the inmate appeal was to grant him the

4 lower custody level that would allow him access to all the programs and group therapy, as well as

5 the outdoor exercise yard. Such a response does not show that they knew of, and disregarded, a

6 risk to Mr. Springfield's health or safety. Mr. Moore's signature on the second level response

7 dated August 9, 2013, does not support an inference of deliberate indifference because there is no

8 evidence that Mr. Moore was then in a position to do anything, given that Mr. Springfield's

9 custody status had already been lowered and DSH rather than CDCR personnel controlled Mr.

10 Springfield's activities. *See Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc)

11 (chief medical officer's decision to sign appeals that he knew had already been reviewed by at

12 least two qualified dentists does not amount to a wanton infliction of unnecessary pain).

13    Mr. Springfield adds a new contention that the January 4, 2013, ICC's decision adversely

14 affected his time-credit earning ability because the ICC determined that he would be in the "D1D"

15 credit-earning status. This contention is a nonstarter because it is undisputed that the next ICC

16 hearing reversed the decision and changed Mr. Springfield's credit earning status to "A1A" as of

17 December 27, 2012, which allowed him to receive the time credits. *See generally Frank v. Schulz*,

18 808 F.3d .762, 763-64 (9th Cir. 2015) (summary judgment properly granted to defendants on due

19 process claim where prisoner filed a successful administrative appeal which led to the removal of

20 the incident report from his file and the forfeited credits were restored). Moreover, if the decision

21 did cause some loss of time credits, Mr. Springfield's claim (which only seeks damages, *see* ECF

22 No. 39 at 14) would be barred by the rule from *Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck*

23 held that a plaintiff cannot bring a civil-rights action for damages for a wrongful conviction or

24 sentence unless that conviction or sentence already has been determined to be wrong. *See id.* at

25 486-87. A conviction or sentence may be determined to be wrong by, for example, being

26 reversed on appeal or being set aside when a state or federal court issues a writ of habeas corpus.

27 *See id. Heck* also prevents a person from bringing an action that would imply that the conviction

28 or sentence is invalid, even if the action does not directly challenge the conviction or sentence.

1  *Heck* bars a claim of unconstitutional deprivation of time credits because such a claim necessarily

2  calls into question the lawfulness of the plaintiff's continuing confinement, i.e., it implicates the

3  duration of the plaintiff's sentence. *See Sheldon v. Hundley*, 83 F.3d 231, 233 (8th Cir. 1996);

4  *cf. Ramirez v. Galaza*, 334 F.3d 850, 858-59 (9th Cir. 2003) (where a claim would, if successful,

5  "necessarily accelerate" the prisoner's release on parole, *Heck* applies). The practical importance

6  of the *Heck* rule is that Mr. Springfield cannot attack a time-credit decision that affects the

7  duration of his confinement *in* a civil-rights action for damages; the decision that caused the time

8  credit must first be successfully attacked by, e.g., a state or federal habeas petition *before* he can

9  file a civil rights action for damages.

10  **C.  Qualified Immunity Defense**

11      The defense of qualified immunity protects "government officials . . . from liability for civil

12  damages insofar as their conduct does not violate clearly established statutory or constitutional

13  rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

14  (1982). The rule of qualified immunity "'provides ample protection to all but the plainly

15  incompetent or those who knowingly violate the law.'" *Burns v. Reed*, 500 U.S. 478, 495 (1991)

16  (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

17      In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-step inquiry for

18  determining whether qualified immunity exists. First, "[t]aken in the light most favorable to the

19  party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

20  right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry

21  ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable

22  view of the parties' submissions, the next, sequential step is to ask whether the right was clearly

23  established. . . . 'The contours of the right must be sufficiently clear that a reasonable official

24  would understand that what he is doing violates that right.' The relevant, dispositive inquiry in

25  determining whether a right is clearly established is whether it would be clear to a reasonable

26  officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting

27  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although *Saucier* required courts to address

28  the questions in the particular sequence set out above, courts now have the discretion to decide

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1    which prong to address first, in light of the particular circumstances of each case. *See Pearson v.*

2    *Callahan*, 555 U.S. 223, 236 (2009).

3          Messrs. Moore and Meden, knowing that inmates had an Eighth Amendment right to mental-

4    health care and outdoor exercise, reasonably could have believed it lawful to decide to keep Mr.

5    Springfield on Maximum Custody status when he provided a written statement expressing safety

6    concerns about being double-celled or placed in a dormitory housing at the ICC on January 4,

7    2013. The circumstances present at the time they acted included not only Mr. Springfield's safety

8    concerns, but also their understanding that the DSH afforded Maximum Custody inmate-patients

9    out-of-cell time, access to mental health professionals, access to medical appointments, family

10   visits, and treatment team meetings with the IDTT that would decide his activities. Because the

11   law did not put the defendants on notice that their conduct would be unlawful, summary judgment

12   based on qualified-immunity is appropriate. *See Saucier*, 533 U.S. at 202. The defendants met

13   their burden of proof in their moving papers. Mr. Springfield did not introduce evidence to show

14   the existence of a genuine issue of fact on the defense. The defendants are entitled to judgment as

15   a matter of law on the qualified-immunity defense.

## CONCLUSION

17         For the foregoing reasons, the defendants are entitled to judgment as a matter of law on the

18   merits of Mr. Springfield's Eighth Amendment claims and on their qualified-immunity defense

19   against Mr. Springfield's suit. The defendants' motion for summary judgment is GRANTED.

20   (ECF No. 29.) Judgment will now be entered in favor of the defendants and against Mr.

21   Springfield. The clerk shall close the file.

22         **IT IS SO ORDERED.**

23   Dated: June 28, 2016                                _____

24                                                       LAUREL BEELER
                                                         United States Magistrate Judge
25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CIRON B. SPRINGFIELD,

           Plaintiff,

      v.

M. MOORE, et al.,

           Defendants.

Case No.  3:14-cv-05676-LB

**CERTIFICATE OF SERVICE**

       I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

       That on June 28, 2016, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Ciron B. Springfield ID: P-70044
Calif. Health Care Facility
P.O. Box 32050
Stockton, CA 95213

Dated: June 28, 2016

                         Susan Y. Soong
                         Clerk, United States District Court

                         By: _____
                         Lashanda Scott, Deputy Clerk to the
                         Honorable LAUREL BEELER

United States District Court
Northern District of California

20